UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

TROCA GLOBAL ADVISORS LLC,

Interpleader Plaintiff,

v.

GLOBAL LIQUIDITY SERVICES LLC, et al.,

Interpleader Defendants.

Civil Action No. 1:23-CV-11546-AK
Pages 1 to 26

BEFORE THE HONORABLE ANGEL KELLEY
UNITED STATES DISTRICT JUDGE

MOTION HEARING

August 29, 2023
2:31 p.m.

John J. Moakley United States Courthouse
Courtroom No. 8
One Courthouse Way
Boston, Massachusetts 02210

Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
lwalshsteno@gmail.com

APPEARANCES:

On Behalf of the Interpleader Plaintiff:

ROSE LAW PARTNERS LLP
By: Alan D. Rose, Jr., Esq.
One Beacon Street, 23rd Floor
Boston, Massachusetts 02108
617-536-0040
adrjr@rose-law.net

On Behalf of the Intervenor Plaintiff, United States Attorney for the District of Massachusetts:

UNITED STATES ATTORNEY'S OFFICE
By: AUSA Neil J. Gallagher, Jr.
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3397
neil.gallagher@usdoj.gov

On Behalf of the Interpleader Defendant Global Liquidity Services LLC:

STEPTOE & JOHNSON LLP
By: Jeffrey M. Reisner, Esq.
633 West Fifth Street, Suite 1900
Los Angeles, California 90071
213-439-9400
jreisner@steptoe.com

On Behalf of the Interpleader Defendant Bulk MRO Industrial Supply, Inc.:

AARON KATZ LAW LLC
By: Aaron M. Katz, Esq.
399 Boylston Street
Boston, Massachusetts 02116
617-915-6305
akatz@aaronkatzlaw.com

Proceedings reported and produced by computer-aided stenography.

P R O C E E D I N G S

THE CLERK: All rise.

THE COURT: Good afternoon. You may be seated. Just a second, Mr. Lara, before calling the case.

THE CLERK: Yes, Your Honor.

(Pause.)

THE COURT: Go ahead, Mr. Lara, call it now.

THE CLERK: The United States District Court for the District of Massachusetts is now in session, the Honorable Angel Kelley presiding. Today is August 29th, 2023. Civil Action 23-11546, Troca Global Advisors LLC versus Global Liquidity Services LLC, et al., will now be heard before this Court.

THE COURT: Can I have the parties state their appearances for the record, and let's start with plaintiff.

MR. ROSE: I'm Alan Rose, Jr., from Rose Law Partners, and I represent the interpleader plaintiff Troca Global Advisors.

THE COURT: Thank you.

Defendants in this action?

MR. REISNER: Good afternoon, Your Honor. Jeffrey Reisner of Steptoe & Johnson for interpleader defendant Global Liquidity Services.

THE COURT: Okay. Thank you.

MR. KATZ: Good afternoon, Your Honor. Aaron Katz for

interpleader defendant Bulk MRO.

THE COURT: Thank you. All right.

MR. GALLAGHER: Good afternoon, Your Honor. I'm the last party. Neil Gallagher for the United States. We are the intervenor in this action.

THE COURT: All right. Thank you.

So I have -- I've reviewed what's been filed, the two motions, the government's motion to intervene and one of the defendants' motions for extension of time. But what I usually like to do is give plaintiff an opportunity to frame their case the first time I see the parties, and so, if you'd like to do that, Counsel, this is your opportunity to do so.

And then I'll give the defendants a chance if they want to add anything.

So Counsel, did you want to speak, Attorney Rose?

Attorney Rose, did you want to talk about your action?

MR. ROSE: Sure, I'm happy to do that, Your Honor, and I'll do it in the context of the issues that I think are going to be most relevant to the issues that are before the Court today.

THE COURT: You don't have to because we're going to get to those. So it's however you choose. Don't feel compelled to be guided by that.

MR. ROSE: Understood. Thank you.

The background, Your Honor, is that Troca is a law

firm, advisory firm that was providing services to Bulk MRO as its client starting in about May of 2020 and running through to about August of 2022. As part of that engagement, Troca held Bulk MRO's assets, including investments in certain entities. Bulk engaged with Global Liquidity Finance to purchase certain goods, like PPE, and entered into financing arrangements between Bulk and Global Liquidity Services.

In the latter half of 2021, a dispute arose before Global Liquidity Services and Bulk MRO. And by September of 2022, Global Liquidity had notified both Troca and Bulk of claims impacting the assets that were held by Troca on behalf of Bulk MRO. Thereafter, the engagement, the legal engagement ended.

But in October of '22, April of '23, and then again at the end of May '23, Troca undertook efforts to place assets with a neutral escrow agent and notified the parties that if it was unable to do so, it would initiate an interpleader action. Over the course of those efforts, it became clear that while Global Liquidity would agree to a neutral escrow agent, Bulk MRO would not, and without the agreement of all parties, Troca was unable to place those assets into escrow. So without that agreement, Troca filed the interpleader action on July 10th, the purpose of which is to adjudicate the issues between Bulk and Global Liquidity and permit Troca to deposit any liquid assets or other investment assets and cash with the Court.

So that's the very basic background of what's going on and why the interpleader action was filed. And what Troca hopes to achieve is depositing whatever assets it is able in with the Court and removing itself from the litigation so that Bulk MRO and Global Liquidity can litigate who's entitled to the assets. And as we set forth in the complaint, there's about $3.4 million at issue. So that's the back story.

THE COURT: Thank you. And for it to be litigated, is that in this action or some other action, the dispute between the defendants?

MR. ROSE: That would be the subject of the interpleader action. It would be the litigation between Global Liquidity and Bulk MRO with respect to who has legal right to those assets held by Troca.

THE COURT: All right. There is another action that your client is not involved in. It's Docket 22-CV-10530 before Judge Talwani, and it includes Bulk. So why don't I give the defendants an opportunity to add any additional facts that you want me to understand about the interpleader and to also let me know is that related to this action before Judge Talwani.

MR. KATZ: Jeff, do you mind?

THE COURT: Why don't you jump in on that one.

MR. KATZ: So the action before Judge Talwani has no relationship to this case as far as I'm aware. I believe that's going to be potentially a default judgment, if one

hasn't already entered.

This is an uncomfortable situation for me, Judge, but I do feel like I'm compelled to correct many things that Mr. Rose said. And I don't think he intentionally is misstating facts because there are facts that I don't think he knows about but that speak directly to the background he just gave you.

I came to represent Bulk MRO in July or August of last year when I was still at Ropes & Gray. During that time, the dispute was not between Global Liquidity Services and Bulk. The dispute was between Troca and Bulk about where five-and-a-half-million dollars of Bulk MRO's money had gone, and it was money that Troca and their principal, Beej Das, who's indicted in front of Your Honor on a case related to this one, what he did with the money.

And I was told by a partner at Latham & Watkins, William Troch, who's a friend of mine, that the money had been invested in a Dubai real estate investment called Kyan pursuant to an escrow investment trust agreement that ran about 70 pages and that my clients had signed while in Provincetown on Mr. Das's yacht.

I asked to see the escrow investment trust, and this is the escrow investment trust that's referenced in the interpleader complaint in this case, because I had never seen it and it was not in my client's emails.

Mr. Troch gave me a document that upon investigation I determined, and I believe the government has alleged in the indictment against Mr. Das, that that agreement is a forgery. I then asked Mr. Troch if he could provide me any account information, a bank statement, a real estate investment trust statement from this supposed Dubai real estate investment about the fact that the money had actually been deposited. Nothing was forthcoming.

This was around the same time that Global Liquidity Services was engaged in a letter writing campaign, and I don't mean that pejoratively, with Bulk's New Jersey-based commercial counsel Patrick Papalia. And that letter writing campaign basically ended sometime in the summer of last year, so ten months basically before this interpleader was filed.

The communication that I had with Mr. Das's criminal counsel, Michael Kendall, about the interpleader and, you know, would you agree to deposit money with an independent escrow agent, which I think is the conversation that Mr. Rose may have been alluding to, what I was told is that the money was invested but not in a Dubai real estate investment but rather was invested in a yacht and a house.

If there had been money and an accounting of money and no evidence, no indication that the money had actually been stolen and that various false statements had been made to me, not intentionally -- Mr. Troch did not make -- he didn't

purposely send me a document that appears to be forged. He got it from his client. But that's why we didn't agree to put money with an independent escrow agent for the purposes of litigating an interpleader action relating to a dispute that basically had gone cold for ten months.

The timing of this action just seems too coincidental to be a coincidence. This action was filed I think shortly after Mr. Das was indicted, and it's just hard for me to believe that discovery in this case would not involve efforts to essentially question my clients about the exact things that they would be asked about at a criminal trial as witnesses against Mr. Das.

But this was not as simple as, oh, there's money, everyone agrees there's money sitting there, and I didn't agree to put it with an escrow agent and Global Liquidity did; that's just not accurate.

THE COURT: So the amount of money that's in dispute is greater than the $3.4 million?

MR. KATZ: My clients believe that $5 million of their money was stolen. And based on the letter writing campaign between Mr. Papalia, Bulk MRO's commercial counsel, and Steptoe & Johnson a year ago, I believe, whether valid or not -- and I'm not going to speak to the validity of Global Liquidity's purported claims against Bulk, but that was like $100 million. So this idea that there's just $3 million

sitting in an escrow account somewhere or a Kyan investment somewhere, and he's been holding that because it's under dispute between the two of us, that just is illogical.

THE COURT: Okay. I'm going to give Attorney Reisner an opportunity to add anything else, but the question that I have for the two defendants, before we even get to the government's motion, if there is money out there that belongs to one of you, why not get ahold of it where it's going to be safe and available for the future to go to one of you?

MR. KATZ: I would love for that to happen, and I've been trying to get an accounting of where $5 million is. If there's $3.4 million in cash somewhere, I would love to see evidence of it. I asked Mr. Das's criminal counsel, Michael Kendall, for evidence that there's any money anywhere, and what he represented to me -- and this was not a 408 conversation. This was him making a nonprivileged representation to me that the money from my clients had been invested in a yacht and a home and that those assets are now under liens by the government because of the criminal indictment. They're basically subject to forfeiture.

And Mr. Kendall asked me, would you, you know, would you call up Neil Gallagher and tell him that Bulk is fine if Mr. Das just, like, sells the yacht and sells the home, and then whatever equity is left from those sales can go into an independent escrow account. And I said, you know, Mike, I'm

going to leave that between you and Mr. Gallagher, but I'm not comfortable with you asking me to sell assets that my clients clearly did not authorize your client to purchase with their money.

02:43 THE COURT: All right. So before we even get to the criminal case, and Attorney Rose is representing that they're prepared to transfer money over to the Court for the Court to hold, why shouldn't that be done is the question that I have. And maybe you don't have the full answer to it, but I'll hear 02:44 from other counsel, and the government certainly has an opinion about that.

But looking at this in the big picture, that seems to be, just from what I've read, the most efficient way to handle this. Let's get the money, let's secure it, stay this action, 02:44 let the criminal case do what it's going to do.

Attorney Rose is representing he's not looking for any discovery. So there doesn't seem to be that issue of more liberal standards of civil discovery, you know, in advance of the criminal trials.

02:44 MR. KATZ: If there is cash, I am all for getting that cash out of Troca's hands and Mr. Das's hands and putting it in a secure place. I have asked for evidence that there is such cash for a year, acting, by the way, pro bono. I mean, I've been representing Bulk MRO for free on this.

02:45 THE COURT: But assuming he's not making that

representation, that there's money ready to be deposited someplace with the Court, I can't imagine that counsel would be making that request.

MR. KATZ: I would be happy --

02:45 THE COURT: All right. So I have your answer.

MR. KATZ: Yes.

THE COURT: You're up, Counsel.

MR. REISNER: Your Honor, my answer is incredibly simple. I completely agree. I assume that Mr. Rose did not 02:45 file an interpleader to deposit air. I assume he has money. I'd like to tie up the money, and I'd like you to proceed in whatever order with stays that you think makes sense to proceed.

THE COURT: Thank you. That was simple enough. 02:45 Attorney Gallagher?

MR. GALLAGHER: I'm going to make this even easier because I also agree that Troca should be able to put money into an escrow account, but there are two things that Mr. Das and Mr. Rose's client need to understand -- and I see 02:45 Mr. MacKinlay is in the courtroom, who represents Mr. Das in the criminal case.

THE COURT: I thought he was with your office.

MR. GALLAGHER: He used to be a former colleague, but now he represents Mr. Das on this criminal case.

02:46 THE COURT: All right.

MR. GALLAGHER: Two things, Your Honor. One is that the payment of this money to escrow accounts is not going to affect this criminal case. This is not going to be a payment in order to get the criminal case dismissed, number one.

02:46 THE COURT: That wasn't what I heard, you know. So what I heard is that or read in the papers that the government's opposed to it because it changes some narrative that they want to be able to tell in the criminal case. I think the criminal case is separate and apart from this action. 02:46 If there's money available, because there are parties fighting over money, let's get that money before it disappears.

MR. GALLAGHER: I totally agree, Your Honor. I think the second point I want to make is that the money that is claimed to have been there in this escrow account is gone. We 02:46 executed a seizure warrant on those accounts. It's gone. Whatever money is going to come forward is coming from a different source. So I want Mr. Das, Mr. MacKinlay, and Mr. Rose to understand that we have an ongoing investigation, and we're going to be looking into where this money came from 02:47 because we have a defendant here who's been charged in two criminal cases, committing this fraud while on release from the first case, and we are very suspicious about where this money came from.

THE COURT: Whether or not it's the money of some 02:47 other victims?

MR. GALLAGHER: It could be, but I can tell you, it's not the money from this account because, as alleged in the indictment, $2.7 million went down to a house that he bought for himself, about $1.2 million went to his criminal defense lawyers, and hundreds of thousands dollars went to personal expenses for the yacht and the business.

THE COURT: Those things have been seized?

MR. GALLAGHER: So there's been a lis pendens filed against the house in Florida. There's been a restraining order that Your Honor filed about the yacht, and the bank accounts. Like I said, they were seized, but there is no money in them. So there is missing assets.

But I -- we will work with Mr. Rose, and if the Court is inclined to allow us to set up an account to have those assets transferred into with the marshals pending the outcome of this case, we can do that.

THE COURT: Okay. So how do we make this happen?

MR. ROSE: So, Your Honor, I sense an opening here because my understanding is that they're -- that one of the investments that the Kyan investment trust made on behalf of Bulk MRO was a note in the yacht that the government has the lien on or the attachment on. And there is an investor who would buy that note, and that $2.1 million could be immediately paid into the Court as part of the interpleader motion.

THE COURT: Is this above and beyond the $3.4 million

or is this to make up part of the $3.4 million?

MR. ROSE: It's part of the $3.4 million.

THE COURT: So there isn't any cash on hand.

MR. ROSE: There's very limited cash on hand, but it is Mr. Das and Troca's position that the investments that were made with Bulk MRO's assets were authorized by the investment vehicle that was set up between Troca and Bulk MRO.

THE COURT: All right. So it becomes a little bit more convoluted to sell something to come up with some money to put some of that toward this 3.4 that supposedly is sitting in some account.

MR. ROSE: So my understanding, Your Honor, is that there is an investor who will buy the note, and those proceeds would be paid into the interpleader action. And that's 2.1 of what Troca contends is $3.4 million of Bulk's assets, as we set out in the interpleader action.

THE COURT: That seems to me to be too many steps to achieve what I thought was a simple solution because you're not really in that position that was represented, that there is $3.4 million sitting in an account someplace and you just want somebody to hold on to it.

MR. ROSE: Well, Your Honor, that wasn't the representation that was made. There are investments that would give liquid, fund the cash portion of what we're seeking to pay into the interpleader action. But at the root of it, the

interpleader action is about who's entitled to whatever assets there are as between Global Liquidity and Bulk.

THE COURT: Okay. Anyone want to say anything?

MR. REISNER: Your Honor, just two observations. You should tie up whatever you can tie up in whatever form you can tie it up, and obviously --

THE COURT: Does that include selling a yacht?

MR. REISNER: I'm just about to get to that.

THE COURT: Okay.

MR. REISNER: Because that's exactly the right next question.

When presented for the first time said by counsel, that there's someone standing by to buy a note, okay, you easily want to subject it to some daylight and see if it's worth 2.1 or 9.8. There's no way to determine the value there. There's no testimony, there's nothing in the record, so you can't go forward with that.

So the answer is I would, not to be presumptuous, I would never authorize the sale, if I were you, of something that you have no data on. So you have to get a hearing and see what happens with that. Maybe that's the right answer.

MR. KATZ: I second that, Your Honor. And this was the exact reason why I was uncomfortable telling Mr. Kendall who -- Mr. MacKinlay I think represents Mr. Das the case in front of Your Honor. Mr. Kendall has the other criminal case

but was acting as sort of a go-between because of my relationship with Mr. Kendall, I presume.

But this is why I was uncomfortable saying, yes, just sell the boat, sell the house, which are under government seizures or lis pendens, and we'll be done with it.

MR. GALLAGHER: Your Honor, my only suggestion is if we do sell assets that are constrained in an interlocutory sale and put them in escrow, we don't know enough about this asset to make that evaluation. So if the Court is inclined to give us 60 days to figure this out, to explore whether or not it's a possibility, the value of the boat and maybe do some homework before we even go there, and if we continue to stay this case until that time, especially after the first criminal trial, and then we can report back to the Court about what can be possibly done.

THE COURT: So why do I need to stay the case? Because some of the defendants have answered?

MR. KATZ: Well, so --

THE COURT: Have not answered?

MR. GALLAGHER: No.

MR. KATZ: -- in terms of my motion to stay, I had been given information from our service of process agent. They have received some sort of process. So it was late on a Sunday night and had they been served, which had I thought they had been, my answer would have been due like the next morning -- I

think even by midnight. I think it was a Monday night when I filed it, possibly. So that was not the same summons. Something else had been served on their service of process agent, I think. So we're in agreement that -- I think we have something like 60 days from two weeks ago or something like that to put in an answer, a motion to dismiss. So there's no crunch of time from my perspective as long as discovery isn't going forward.

MR. ROSE: I think the answers would be due on October 10th. So there's no timing issue.

THE COURT: Okay. So 60 days for the parties to collectively speak to each other, figure out what's available, what can be liquidated, if anything, to put money in an account to be frozen for future dispute?

MR. ROSE: I don't want to agree to a stay, Your Honor, because I'd like the answers to be filed by October 10, but I don't see why we can't execute on what Mr. Gallagher is suggesting.

THE COURT: Is there any reason why an answer can't be filed? There is certainly plenty of time.

MR. KATZ: I'm -- I can easily file an answer by that date. I'm exploring whether a motion to dismiss is proper. I think there's tons of potentially subject matter jurisdiction issues with this complaint. So I'm happy to put in an answer so long as I'm able to put in a motion to dismiss potentially

as well after that. I mean, if I have to draft a motion to dismiss right now, I probably would ask for more than to October 10th because I have a criminal trial coming up in this courthouse relatively soon.

02:54 THE COURT: Counsel, Attorney Reisner?

MR. REISNER: Your Honor, we're investigating things like proper venue as well, so if that helps inform the Court. The other thing I would say is the one thing we should walk out of here with is a prohibition against transferring any of the assets.

02:55 THE COURT: Well, let's see. There are -- according to everyone there are no assets in this account, and I think the government has got a lock on everything, right?

MR. REISNER: Cash.

02:55 THE COURT: I'm sorry?

MR. REISNER: They said there's some cash, minimal cash and some other assets. So we ought to just tie things up so the government doesn't rush off and sell things and Bulk doesn't run off and sell things and Troca doesn't run off and sell things. 02:55 The assets that are under Troca's control that are tied to Bulk ought to just be frozen. We can all come back and figure it out. The government can make its proposal, take its investigation, look at the 60 days and see what it wants to do. We'll come back better informed.

02:55 THE COURT: Attorney Rose, what do you know as far as

what cash is available?

MR. ROSE: My understanding, Your Honor, is there's very limited cash available.

THE COURT: What does that mean? $5? $200,000?

MR. ROSE: I'm not prepared to make a representation to the Court about exactly how much is there in cash right now.

THE COURT: And are we talking about in the account or are we just talking about assets that the individual has?

MR. ROSE: I mean, from my perspective, the assets that are at issue are the assets that are in the Kyan investment trust that was set up with Bulk MRO's assets. Those are the assets at issue, that's what we're seeking to litigate in the interpleader action or have the other parties litigate in the interpleader action.

MR. KATZ: I would like to go one step further, Your Honor. I second Mr. Reisner's suggestion that some sort of order be put into place. But I think the order, if this Court agrees it has the authority to, should be even broader, and the definition of control should be quite broad. So the Boca Raton house that the indictment alleges was purchased with my client's money, it was purchased, so far as I could tell, with cash. It was purchased for cash. And then a mortgage was taken out to monetize the house. The mortgage was taken out in the name of Mr. Das's mother and fiancée. So if there's cash floating out there somewhere, it may not be in a bank account

with Das's name or Troca's name. It could be in another person's account that Mr. Das and Troca does effectively control, but maybe Mr. Rose isn't even aware of that account, maybe the government is not aware of that account. So I'd be all for a prohibition on Troca's transfer of money.

02:57

THE COURT: I don't see how I can prohibit others, you know, these family members that you're referring to, from transferring anything.

MR. KATZ: But I think it's because Mr. Das controls Troca, and to the extent he controls other people through agreements with those people about you're going to keep this money for me but in your name, I just -- I think it would be helpful to have an order.

02:57

THE COURT: I think they subject themselves to potential criminal prosecution, and so I think that that's probably the right place for that action to take place. I don't see how I can restrain them from doing it.

02:58

MR. KATZ: I appreciate it. Thank you.

THE COURT: Let me hear from the government.

MR. GALLAGHER: Your Honor, it's a Title 18 crime to knowingly transfer an asset a person knows to be subject to a restraining order, and I'm sure Mr. MacKinlay knows this, that the indictment alleges that if the property is transferred, the government has the right to go after sub two assets. We don't take a position on that, Your Honor, but that's the -- the

02:58

02:58

Court is correct, that is a crime.

THE COURT: So what I'm going to do is I'm going to -- I doubt there will be an agreement, but consult with Attorney Rose as well on submitting a proposed order for restraining the plaintiff from transferring any funds, and I'll review it and consider it. To the extent that there is some objections, you can file that overnight. How quickly can you do it, submit the proposed order? But I suggest that you consult with all those who have some interest in the various property that's at issue here.

MR. KATZ: I'm happy to prioritize this, Your Honor. So as quickly as we can get an accounting, yeah.

MR. GALLAGHER: Here's the problem, Your Honor, and this is where I'm standing up for Mr. MacKinlay is that Mr. Rose's representations about this Kyan Hospitality Group are not correct. The money was never in this Kyan Hospitality Group. So the further on that he pushes this, he risks admitting to part of the criminal conduct of the indictment before Your Honor. So I would just suggest that we allow the parties to take a break before coming back to the Court before we dive into this full on.

THE COURT: Okay.

MR. REISNER: You don't mean like right now?

MR. GALLAGHER: Come back in 60 days to address the issues, not like now physically. I'm sorry. I wasn't clear

about that.

THE COURT: So your proposal is we come back in 60 days, which I agree with and will do, but the question about a restraining order at this point in time, are you comfortable waiting that 60 days or no?

MR. REISNER: Let us try to put something together, Judge.

THE COURT: Okay. All right.

MR. REISNER: I think the parties can agree.

THE COURT: I hope so. So what time frame, just so I don't lose track of this. Are we talking about a day, a week?

MR. REISNER: Let's try for a week.

THE COURT: All right. All right. And so submit a proposed order, if one is ready, and give me a status report if more time is needed, or if someone wants to file an objection to it, you know, let me know what that is in a week's time, okay? Good enough.

Anything else, Attorney Rose?

MR. ROSE: No, Your Honor. Thank you.

MR. REISNER: Thank you, Your Honor.

THE COURT: And I just wonder whether or not there is -- even though the criminal action is not before the Court now, whether or not -- but I'm sure that all of you will think about it, whether or not it's more appropriate to take action in the criminal case versus the civil case, but the five great

minds plus three more in the back -- I don't know if you're related to this case or not, but you know, I'm sure that you'll come up with great plans for me. So give me a status report and possibly a proposed order in a week's time. See you back in 60 days. Mr. Lara is going to give us a date.

THE CLERK: Tuesday, November 14th, 2:30.

THE COURT: Let me just take a look.

MR. ROSE: Sorry. Can you say that again?

THE CLERK: Tuesday, November 14th at 2:30 in the afternoon.

THE COURT: Take a look at that.

MR. KATZ: I think I have an arbitration that day, unfortunately.

THE COURT: Yeah. Let's -- just give me one second and just take a look. What about the 13th?

(The Court confers with the Clerk.)

THE CLERK: How about Monday, November 13th?

THE COURT: 3:30 or so or 3:00.

THE CLERK: At 3:00 o'clock.

THE COURT: Does that work? It's a Monday.

MR. KATZ: Fine here.

MR. REISNER: Yes, Your Honor.

MR. ROSE: Yes, Your Honor.

THE COURT: Okay. Very good. Thank you.

THE CLERK: We're adjourned.

THE COURT: So I'm not going to take any action on the motions. I'm sorry, Linda.

MR. KATZ: Your Honor, if it's helpful, I can just withdraw my motion to stay. It's sort of moot for now or not ripe for now.

THE COURT: Wait a second.

MR. KATZ: I'm happy to do it on the docket, if that's easier.

MR. REISNER: Your Honor, may I be excused? I'm going to try to catch a flight.

THE COURT: Go for it.

So your motion was a motion for an extension of time?

MR. KATZ: Yes. Yes, a motion for extension of time.

THE COURT: That's fine. You can withdraw that, and I'm not going to take any action on the government's request to intervene.

MR. GALLAGHER: Yes, Your Honor. Thank you.

THE COURT: All right. Thank you.

THE CLERK: We're adjourned.

(Adjourned at 3:03 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Linda Walsh, Registered Professional Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 3rd day of September, 2023.

/s/ Linda Walsh

Linda Walsh, RPR, CRR

Official Court Reporter