UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| TROCA GLOBAL ADVISORS LLC, | ) | |
| Plaintiff, | ) | Civil Action |
| v. | ) | No. 1:23-cv-11546-AK |
| | ) | Pages 1 to 41 |
| GLOBAL LIQUIDITY SERVICES LLC, et al., | ) | |
| Defendants. | ) | |

BEFORE THE HONORABLE ANGEL KELLEY
UNITED STATES DISTRICT JUDGE

STATUS CONFERENCE

November 13, 2023
3:05 p.m.

John J. Moakley United States Courthouse
Courtroom No. 8
One Courthouse Way
Boston, Massachusetts 02210

Linda Walsh, RPR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way
Boston, Massachusetts 02210
lwalshsteno@gmail.com

APPEARANCES:

On Behalf of the Intervenor Plaintiff United States Attorney for the District of Massachusetts:

UNITED STATES ATTORNEY'S OFFICE
By: AUSA Neil J. Gallagher, Jr.
One Courthouse Way, Suite 9200
Boston, Massachusetts 02210
617-748-3397
neil.gallagher@usdoj.gov

On Behalf of the Plaintiff Troca Global Advisors LLC:

ROSE LAW PARTNERS LLP
By: Alan D. Rose, Jr., Esq.
One Beacon Street, 23rd Floor
Boston, Massachusetts 02108
617-536-0040
adrjr@rose-law.net

On Behalf of the Defendant Global Liquidity Services LLC:

STEPTOE & JOHNSON LLP
By: Jeffrey M. Reisner, Esq.
633 West Fifth Street, Suite 1900
Los Angeles, California 90071
213-439-9400
jreisner@steptoe.com

On Behalf of the Defendant Bulk MRO Industrial Supply, Inc.:

AARON KATZ LAW LLC
By: Aaron M. Katz, Esq.
399 Boylston Street
Boston, Massachusetts 02116
617-915-6305
akatz@aaronkatzlaw.com

Proceedings reported and produced by computer-aided stenography.

P R O C E E D I N G S

THE COURT: Good afternoon. You can be seated. Give me a second before calling the case.

THE CLERK: Yes, Your Honor.

03:05 (Pause.)

THE CLERK: The United States District Court for the District of Massachusetts is now in session, the Honorable Angel Kelley presiding. Today is November 13th, 2023. Civil Action 23-11546, Troca Global Advisors LLC versus Global 03:05 Liquidity Services, LLC, et al., will now be heard before this Court.

THE COURT: Good afternoon, Counsel. Please state your appearances for the record, and let's start with plaintiff's counsel.

03:05 MR. ROSE: Alan Rose, Jr., from Rose Law Partners on behalf of Troca Global. Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. REISNER: Good afternoon, Your Honor. Jeffrey Reisner of Steptoe & Johnson for Global Liquidity doing 03:05 business as VendorPayment.

THE COURT: Thank you.

MR. KATZ: Good afternoon, Your Honor. Aaron Katz of Aaron Katz Law for defendant Bulk MRO Industrial.

THE COURT: Thank you.

03:06 MR. GALLAGHER: Your Honor, Neil Gallagher, U.S.

Attorneys' Office, as the intervenor in this case.

THE COURT: All right. Thank you.

So the last time we were together the parties were going to confer. We had some motions that were pending at that point in time, and the parties were going to see if they could work out something that was acceptable to all parties. It appears that that's not the case.

Who would like to speak first to sort of give me a further update? Anyone in particular? Have you discussed it?

MR. ROSE: I can try, Your Honor, and then --

MR. KATZ: Sure, go ahead.

MR. ROSE: -- and then others can jump in.

We did have some back and forth between counsel. We were unable to reach an agreement, so there are now two of what I call competing proposed orders in front of the Court, but I'm happy to advocate on behalf of our order. But that's essentially where we stand today. No answer has been filed. We pushed that issue over about when the answer would be until --

THE COURT: So that's the motion to extend time, right?

And one of the issues that was raised previously is whether or not this action should be stayed pending the criminal action. And so I guess that is still also on the table, and I'd be interested in hearing from the parties their position with regards to that.

But either pick up from there or you can tell me about your proposed order, and I appreciate that your client has concerns because there's a pending criminal case.

MR. ROSE: Yes, certainly.

Let me jump into the proposed order, Judge, and then we can cover the other issues.

You'll recall on August 29, toward the end of the hearing my brother, Mr. Reisner, raised the issue about whether or not there should be some type of judicial action prohibiting the transfer of any of the assets, and what he said was, "The assets that are under Troca's control that are tied to Bulk ought to be frozen." And I followed that up, and I said --

THE COURT: Let me just make sure I have it.

MR. ROSE: That's on page 19 of the transcript.

THE COURT: I don't have the transcript in front of me, but just give me one second. Okay. So?

MR. ROSE: So he said the assets that are under Troca's control that are tied to Bulk ought to just be frozen, and that was on page 19. And then on page 20 I said, "From my perspective, the assets that are at issue are the assets that are in the Cayan Investment Trust that was set up with Bulk MRO's assets. Those are the assets at issue." In other words, Judge, those are the assets that are at issue in the interpleader action. It's the assets that were originally Bulk MRO's assets that Bulk MRO and Mr. Reisner's client have a

dispute about, and they both acknowledge that in the papers supporting the competing motion. So what we -- or competing order.

So what we tried to do was fashion an order that went along with that. In our view, that starts with defining the assets at issue as the assets that originated with Bulk MRO. Those are the assets at issue in the interpleader action, those should be the assets that are at issue in the order. But obviously, Your Honor, we thought we had to go beyond just dealing with those assets, so we extended it both to Troca and Mr. Das's inability to, call it, dissipate those assets, and that's the second sentence of our proposed order.

So just to juxtapose that with the interpleader defendants' proposed order, which we view as overbroad, in the first clause there it starts off by tailoring their proposed order to the assets of Troca, the law firm, and we think that's overbroad because it goes beyond the assets at issue in the interpleader action and beyond the assets that originated with Bulk MRO. Their bullet point number one in their order, had it been limited in that way to Bulk MRO's assets, I think would be largely fine with us.

And then, as the Court indicated, with respect to number two, we have concerns about the Fifth Amendment privilege of Mr. Das. Having said that, as we acknowledge in our papers, the Fifth Amendment is only testimonial in nature.

It doesn't extend to documents -- corporate documents maintained by Troca, and those would have to be produced, just not in a way that compromises Mr. Das's Fifth Amendment rights. So those are the issues with respect to the order as we see them.

03:11

If you want me to jump to the second issue, the intervention and the stay, I'm happy to address that, too.

THE COURT: Why don't you go into that now.

MR. ROSE: Okay. We fully briefed that issue back in the summer, and you know, our arguments are set out fully there. But the first point, Judge, is that with respect to Rule 24(a), which is commonly known as intervention as of right, here the government simply seeks to get in the middle of the litigation process, and that's simply insufficient under the case law to intervene as a right under Rule 24(a).

03:11

03:12

With respect to so-called permissive intervention under Rule 24(b), that requires that there be a common question of law or fact at issue in the criminal case on the one hand and the civil case on the other hand. And here the questions of law and fact are different. And all we're seeking to do in the interpleader action is to safeguard the assets so that the interpleader defendants can litigate over them. And as I said, they both acknowledge that there's a dispute over that.

03:12

The second point the government made was with respect to whether or not there should be a stay in this case. We

03:12

submit, Your Honor, that the government's effort to stay this is nothing more than a way to try to strengthen its hand in the criminal case, leaving effectively the assets at issue tied up; whereas we would like to get those assets liquid and deposit it with the Court in the interpleader action.

THE COURT: But my recollection from the last hearing is that it wasn't clear what your client actually had control over.

MR. ROSE: Troca has control over several investments, one of which is the yacht, all of which originated with Bulk MRO. The issue that the Court dove into back on August 29th was about the availability of cash assets, and there are not any cash assets at this time.

THE COURT: Okay. Counsel?

MR. REISNER: Your Honor, for the record, Jeffrey Reisner, Steptoe & Johnson, for Global Liquidity and VendorPayment.

Your Honor, I'll go first and then yield to my friend from the other firm. Because I was quoted, let me go first. Assets linked to Bulk, true. I stand by that. Here's the problem. We can't tell which assets are linked to Bulk because we can't get any discovery. We can't pressure test anything. We know that the plaintiff showed up with assets implying millions of dollars of value. Now they're not millions of dollar in value. You have a thinly veiled corporation with one

person who's now pleading the Fifth on behalf of its individual so we can't do discovery. So we don't know what is subject to or touches Bulk, which means we don't know what is subject to our dispute.

03:14 I would say, having thrown itself on the mercy of the Court in the form of an interpleader, the right answer is as follows. Let's let the government intervene; no harm, no foul. Let's stay the proceeding until the Fifth Amendment issue is resolved. Let's do some discovery, find out what assets there 03:15 are. And if by chance there is some burning need for Troca to dispose of an asset, let them come before the Court and say here's why we need to do it. And we'll have a hearing. And I'm sure you'll be persuaded to do the right thing, and that will be at that.

03:15 But right now you can't, on the one hand, say there's an interpleader we need. These assets are subject to other claims, but we can't talk to you about them because we have a Fifth Amendment issue but we should get rid of the lawsuit or not let the government in and not have a stay. Those things 03:15 can't exist in time and space.

We're just saying put a pause on it. I have no desire to affect anybody's Fifth Amendment rights, even though I don't think Troca is allowed to assert those rights. Regardless, let's just stay it. Let the government do its thing. We'll 03:16 figure it out. There's been no showing made of any need or

desire to distribute any assets, to figure it out.

What we do know is that assets have moved around because this originated -- this money originated with an asset that's no longer around, has now turned into a loan on a yacht. Who knows where it is. Who knows what the proceeds of the proceeds are, and that's the problem. We can't test anything.

Thank you, Your Honor.

THE COURT: Before you sit down --

MR. REISNER: Yes.

THE COURT: -- is there -- is there an agreement in the short term until I can decide more fulsomely all of the motions that are pending, whether or not to stay it?

MR. REISNER: I think various parties are in agreement on various things. So I think you have three-way agreements on everything with four parties. So I think there's always three people lined up the same way.

THE COURT: Okay. The one that includes plaintiff?

MR. REISNER: I don't know if anything includes plaintiff, other than -- I mean, I'll let plaintiff respond. But I think you don't have any of the four or five points with all parties in agreement, but I'll yield to my --

THE COURT: So even plaintiff's proposed order in the interim, until I make a decision in the next month or so, is that enough at this point -- would there be an agreement at this juncture until a fuller decision is made?

MR. REISNER: That's a good question. I misunderstood. Let me answer better this time.

It goes to this: Mr. Rose made a point of saying here are the assets that I believe are the ones that are subject to this action, and therefore, this should only cover those assets. While I like Mr. Rose very much, that's not credible testimony. It's not evidence.

And so we're looking for something broader that says, look, anything that could be -- because we don't know about the proceeds issue. We don't know what was involved. So we're in agreement that it's anything that could be tracked back to the other party, but we can't answer the question definitively. That's what we've been trying to do.

So in other words, when I made my statement last time, which I stand by, I assumed there would be discovery and some sharing of information. I didn't expect the Fifth Amendment to show up. And we read about that a lot, but in civil actions it doesn't show up a lot. And so there's agreement on the terms of our order between Bulk and VendorPayment, but that's too broad for Mr. Rose's line. I think the government is fine with our order because it's the broader order.

But until we can get to the sum and substance of the assets that are in question, it's hard to say, yes, that's okay. Because we don't have any evidence that that's all there is, and we're trying to get to that answer. And in light of

the nature of the company, the nature of the allegations, the thinness of the capitalization, and the fact that it is all tied to the same individual, you can't really take a lawyer's comment in Court as -- in good faith as it is, you can't take it for, you know, for the truth, and that's the issue.

So if you wanted to stay everything for a month and figure it out, that's fine. Maybe there's a mechanism that we can come up with some discovery that makes some sense.

THE COURT: If the parties haven't reached an agreement since August, it's not likely, in my opinion, that the parties would reach an agreement in the next 30 days or so.

MR. REISNER: It's only one path. Just to refresh your recollection, Your Honor, the government had made a statement at the last hearing -- I'll paraphrase -- to the effect that the government was looking into what the assets were, and there was some thought that we might let the government complete its investigation because it may answer the question. But yes, agreement is one way, your ruling is another way, and the government's investigation is theoretically out of it.

THE COURT: Thank you. Attorney Katz.

MR. KATZ: Your Honor, from my client's perspective, and frankly, I think, probably from Mr. Reisner's client's perspective, the big problem, that sort of initial problem with this interpleader action is that my client and Mr. Reisner's

03:20 client have been dragged into this Court because of a decision made by Troca, and Troca is trying to say Bulk and Brevet, Mr. Reisner's client, Global Liquidity, you have to litigate right now in Boston Federal Court a dispute between the two of you. There's a contract between Global Liquidity Services and Bulk MRO that says if we have a dispute, it should be litigated in the courts of New York under New York law.

My client and Mr. Reisner's client had independently made the decision that now is not the time that they want to bring their disputes into a court of law because that's expensive. Just being here today is expensive for my client, and it's more expensive for Mr. Reisner's client because he had to fly here from California.

It would be one thing if Troca truly was holding assets that we were presently fighting over, therefore putting Troca at some sort of risk of liability if they do something with the asset that impairs them, but here's what the assets are, because Mr. Rose and his partner provided a listing of the four assets, actually described them to me in an email. So whereas previously Troca should have been holding $5 to $6 million cash in either an IOLTA account or a bank account that essentially would act like an IOLTA account for the benefit of Bulk MRO, the assets are now investments, and I use that term very loosely, being held by Cayan Group, a single member LLC based in New Hampshire where the member appears to be one of

Mr. Das's business confederates. And the four assets that Cayan Group is allegedly holding on Bulk MRO's behalf, that according to the interpleader action we're at war over, we're fighting over Global Liquidity Services and Bulk MRO, is a mortgage on the 108-foot yacht, not the 108-foot yacht itself, but a mortgage on it. The yacht itself is frozen in the criminal action. So asset number one is the mortgage. Who's the mortgagee? Who's paying that mortgage? Okay. What are the terms of that mortgage? What's the amount of the mortgage? Are there payments being made? Nobody knows. But certainly we're not fighting over a mortgage on a frozen ship.

Number two, equity interest in a Cannabis store located in Grafton, Massachusetts. Okay. I don't think that Global Liquidity Services and Bulk MRO are presently fighting over who should get an equity interest in MJ's Cannabis in Grafton.

Item number three, something that Mr. Rose calls litigation financing, litigation financing in a civil antitrust case brought by the cannabis store in Grafton against a cannabis store competitor. Well, okay. So what is the equity that Cayan is holding? Does Cayan get, like, a cut of the damages that the plaintiff might receive in this civil antitrust case, which, on its face, if you read the complaint, appears to be complete nonsense, and that case was brought by Mr. Das. He's one of the counsel for the plaintiff in that

action.

And number four is a note from Troca Capital. So I read that as Troca Capital owes Cayan Group money. Troca Capital has a nonexistent website. It appears to be a basically bogus company being run by an individual who was convicted last month in this courthouse of felonies, and is under indictment in this courthouse on other felonies that will be tried presumably within the next, you know, 9 to 12 months.

In short, these are not assets that, one, appear to have any value at all, and they're certainly not assets that Mr. Reisner's client and my client are fighting over presently. I don't think anyone would touch these with a 10-foot pole.

This case should be stayed. In fact, it should be dismissed for lack of subject matter jurisdiction, but at a minimum, it should be stayed because there's not actually a bona fide dispute over the assets that I just laid out. These are not assets we're fighting over, that we want, that we're trying to get. If there's a dispute between Bulk MRO and Global Liquidity Services, we should have the option to resolve that dispute in the court that we selected in our contract, a New York court, and to do it at a time on terms that suit both of our clients. Right now our clients don't want to be spending money litigating our disputes.

And Mr. Das and Troca Global Advisors is essentially saying no, no, no, you have to be forced to litigate that

dispute in Boston Federal Court because of these junk assets that I'm holding.

This is just not a proper intellectually sound interpleader case. I think it should be dismissed for lack of subject matter jurisdiction. There's no real claim or controversy over these assets in particular. At a minimum, the case should be stayed, at a minimum, the case should be stayed so that we don't have to expend money on it.

THE COURT: And staying the action, that replaces this proposed order that's been titled "Joint Motion For Order"?

MR. KATZ: Well, I mean, honestly --

THE COURT: Because you're not interested in these assets?

MR. KATZ: Well, I don't see how these assets could even be dissipated. These are not -- I mean, the mortgage, what, are they going to sell the mortgage on the market equity in MJ's Cannabis? I mean, what are they going to do, liquidate the cannabis shop?

THE COURT: So with regards to document 26 that was filed that's titled "Defendants' Joint Motion for Order" that lists items one and two, so you're not really asking for that, you're asking for it to be stayed?

MR. KATZ: I'm asking for it to be stayed. I mean, look, I'd love an order saying don't dissipate your assets, but if these are the only assets, these four things I just laid

out -- because the ship itself --

THE COURT: Because it's not very clear what these assets are that are listed here. It just says --

MR. KATZ: It's not clear at all.

03:27 THE COURT: -- boats, notes, cash, real estate, or other property. Yes.

MR. KATZ: I don't think I wrote it boats, notes, but that would have been a better way to write it. It has a little jingle to it.

03:27 THE COURT: That's what I see here.

MR. KATZ: Does it say boats, notes?

THE COURT: Boats, notes, cash, real estate, or other property.

MR. KATZ: I'm going to credit Mr. Reisner for the

03:27 rhyme. The boat itself is safe. The boat itself is frozen. The home in Boca Raton that my clients believe Mr. Das bought with or bought in the name of his mother and girlfriend with Bulk MRO's stolen money, that's frozen. The freeze in the criminal case keeps the real assets safe. This mortgage that's

03:27 not really described, this equity interest in the cannabis shop that probably is not worth much at all, the litigation financing in a joke lawsuit, and a note from a company that's not a real company and is run by someone who's a felon, a convicted felon now and under indictment, that's not worth

03:28 anything. So, you know, I think the freezing order in the

criminal case sufficiently protects the assets that really do have value here.

THE COURT: So I'm hearing two things, but I think your preference is to stay it because that keeps litigation costs down versus just moving to a motion to dismiss?

MR. KATZ: Yes, yes.

THE COURT: Okay.

MR. REISNER: Your Honor, we would agree. I think the extent, Your Honor, is looking for commonality, which you started out by saying, we agree, stay it. We don't agree with dismissal because we started in a different place. I understand that plaintiff listed four, maybe, assets. As an insolvency practitioner, I can tell you mortgages can be sold and liquidated always to a friend, always at a price that makes you unhappy after you hear about it, but they can be dissipated in that sense of the word. We just want to stay it.

And we don't know what's a product of the money. What you heard was not listed, there is a house in Boca Raton that Bulk believes originated with their assets. Okay? That's not on the list. The point is, we don't know what's on the list. The real list, the real list is still --

THE COURT: So that mortgage that was referenced was not that home?

MR. REISNER: It's a mortgage on the boat.

THE COURT: A boat.

MR. KATZ: There's a home -- I think I know these details in more intimacy, Mr. Reisner. But there's a home in Boca Raton.

THE COURT: And has that been frozen by the government?

03:29 MR. GALLAGHER: Your Honor, the government filed a lis pendens on the property in Boca Raton.

THE COURT: Okay.

MR. KATZ: So the home was purchased in the name of Mr. Das's mother and Mr. Das's girlfriend/fiancee. The mother 03:29 and fiancee a few months after that took out a mortgage on the property with a company called CrossCountry Mortgage for I think about $2 million. So they bought a house -- they bought a two and a half million dollars house with cash and then monetized the house with a $2 million mortgage after the 03:30 purchase, a very unusual transaction. That $2 million, did it go to Das, did it go to his mom and his girlfriend, did it go to his mom and his girlfriend and then to Das? If so, what was he using it for? Did he use it to pay his legal fees in the criminal case he was just convicted in? No one knows that.

03:30 I agree with Mr. Reisner. That home and the cash that was freed up with that mortgage, that was not on Mr. Rose's list. We have no idea where that cash is. I would love to find out where that cash is. I'm sure the government would love to find out where that cash is.

03:30 I do think Your Honor should say to Troca, I'm going

03:31 to order you to tell me where that cash is because they filed the suit -- Mr. Das filed the suit. I understand that Your Honor doesn't want to force Troca in this lawsuit to tell the Court where cash went, where the cash technically originally went to his mother and his girlfriend; I think the Court should order that. I understand that the Court does not want to order that, but that's the story with the house.

MR. REISNER: And Mr. Das is in enough trouble both with the government and with his girlfriend and mother owning real estate together that I don't want to cause him any further harm in the short term, but we don't know where the money is. And it could be somewhere else. That's why we asked for the broad order, we asked for the stay in order for the government to finish.

Troca is here voluntarily. Mr. Das is not. And that's why we just urge for this kind of center approach, give Your Honor as much time as you need, and if you want to take a year if that's how long the government is going to take, that's fine, because we are going to need to figure it out. But meanwhile, we're going to feel silly to wake up one day and there's no assets left.

THE COURT: Right. So I thought what I understood you to say is that you wanted the stay and not worry about this interim order that pertains to identifying what the assets are because you don't really believe that they're assets.

MR. REISNER: No, no. I believe there are assets. I just don't believe they are the ones that were named.

THE COURT: The ones that were?

MR. REISNER: Named. I believe there are assets. The question is going to be put somebody under oath, do some discovery, and see where they really are. It sounds like this money has moved several times already. That's why I want to slow it all down, freeze it all, stay the suit. Let everybody else do their thing, and we'll come back to you.

03:32 Maybe we will -- maybe we will have resolved the issues between now and then, but at least we will not see further dissipation. Because, he's right, when you see a purchase for cash followed by a cashout mortgage with no explanation where the money went, it went some place it's not supposed to go. And if that money originated with these parties, that's why we need to track it down.

And I understand the issue. On the one hand, you know, no stay, you know, and no freeze, and on the other hand, Fifth Amendment. You can't have it both ways. They came here voluntarily. We need to do justice and make sure the money is here, to the extent it's left. We may never get it back at this point. It may be too late, but let's not make it worse.

MR. KATZ: Mr. Reisner correctly states my view that that type of I would call it appropriately aggressive order requiring Troca not to just send me an email listing assets but

03:33 actually to answer an order of the Court listing out all the assets that even indirectly, you know, went from Troca to the mom/girlfriend, right, because those funds, we believe, originated in the Troca accounts that were supposed to be held for Bulk MRO, that is my dream scenario. I do think it's an appropriate one, too. I understand that the Court thinks it's too aggressive. I don't think it is. But a stay plus that type of order would be my ideal scenario. Because I agree, there's more than just these four assets that I listed. 03:34 There's cash somewhere, but no one knows where it is.

MR. REISNER: To be clear, Your Honor, I don't think counsel knows.

MR. KATZ: I agree.

THE COURT: I think you said that the last time as 03:34 well. Attorney Gallagher, did you want to speak?

MR. GALLAGHER: Just really quickly, Your Honor. Number one, the issue of the Fifth Amendment, just for the Court's -- the Court is aware of this, but the First Circuit squarely decided this in Amato. It's 450 Fed.3d 46. Single 03:34 holder, shareholders, person, LLC does not have a Fifth Amendment privilege. The matter of production or testimonials is not an issue.

I'm not sure what we're doing here, Your Honor. I mean, like, every time Mr. Rose files something with the Court 03:34 that falsely represents where the money went, he's providing me

evidence that I'm introducing in front of a jury within a year from now. And so the stay really is helping Mr. Das. I mean, like, everything he has said about this money, this is a paper trail.

03:35 THE COURT: It seems to me that that would be a true statement, that the stay would benefit the criminal defendant in the case.

MR. GALLAGHER: I can tell the Court that -- well, money is not hard to trace, and what Mr. Rose is representing, 03:35 which I'm sure his client told him, is just not true. Every time he does that more, he's providing to the government more evidence about his criminal conduct.

THE COURT: Attorney Rose, did you want to say something else?

03:35 MR. ROSE: I just think they're conflating Mr. Das's Fifth Amendment right with Troca's Fifth Amendment right. There can be document discovery in the case. Mr. Das can't be compelled to testify against his own interest. But document discovery can occur with Troca. Just Mr. Das can't be 03:36 compelled as an individual to testify.

THE COURT: And so you're raising this for what purpose? To punctuate what point?

MR. ROSE: Well, the allegation is that there can't be any discovery in the case. The case can't move forward because 03:36 Mr. Das won't testify if he's forced to incriminate himself,

03:36
03:36
03:37
03:37
03:37

and my point is that Troca, the LLC, has no Fifth Amendment right, so it can produce documents in response to a subpoena just the way any party would in a civil case.

THE COURT: All right. So you want the action to go forward and not be stayed. You want to provide a list of the assets? I thought I was hearing that you didn't want to do that.

MR. ROSE: No, Judge. What we want to do is have the case go forward. We want the defendants to answer. We will participate in discovery as a party in the civil litigation would participate in discovery, just not to the extent that it implicates Mr. Das's Fifth Amendment rights.

THE COURT: Okay.

MR. KATZ: Your Honor?

THE COURT: Give me one second.

MR. KATZ: Yes.

THE COURT: Why do you want it to go forward?

MR. ROSE: Because as both of the interpleader defendants acknowledge in their response to our motion for an order, there's a dispute over these assets, whatever the corpus is of these assets. I mean --

THE COURT: But that's not really a dispute between them. That's a dispute with you and your client.

MR. ROSE: No. No, Your Honor, respectfully. It's a dispute between them, who's entitled to those assets. Those

are assets that originated with Bulk MRO that were held by Troca as counsel for Bulk MRO. And now both Bulk and Brevet, Global Liquidity, have a claim to those assets. That's why when you said to Mr. Katz and then Mr. Reisner followed up, so you don't care about those assets? And they said, oh, no, we care about the assets. They do care about the assets. If they were liquid, they'd be all over them.

THE COURT: All right. So I don't see how I allow the action to go forward and deny the motion for a stay without requiring you to identify the assets.

MR. ROSE: So the records about the assets will be produced. Whatever they are, they'll be produced.

THE COURT: Okay.

MR. ROSE: In a perfect world, Judge, someone would take the deposition of a witness. That's not going to happen here because of Mr. Das's Fifth Amendment rights. We said that in our papers, and counsel have made that abundantly clear. We agree with them, and that's why I'm making the point about the Fifth Amendment. Mr. Das has that privilege. The entity, the LLC, does not. And there's no -- there's no testimonial privilege that attaches to the documents, so the documents have to be produced.

THE COURT: So if I were to adopt the second paragraph of the defendants' proposed order which says within 14 days Troca will specifically identify the assets it contends that

are in Troca's custody or possession, and you, rather than having Mr. Das testify, that you would produce documents. So at least that would be a start to identifying it so that you'd have the benefit of that, and then a stay; does that make sense?

03:39

MR. ROSE: Well, we don't agree with the stay, Your Honor. But certainly if there's an order that requires the production of documents, Troca would comply with that and produce the documents but --

03:39

THE COURT: So he sounds like -- he's agreeing that documents should be produced to identify these assets.

MR. REISNER: We agreed documents should be produced. We agree that it's normal to have someone testify. He's saying we can't do that. Okay.

03:40

So we're in the very strange position of somebody -- of a plaintiff and interpleader arguing that, you know, these aren't our goods, these aren't our things but, but we're --

THE COURT: What do you mean these aren't our things?

MR. REISNER: In other words, these assets that

03:40

they've identified. Forget about the ones that we've identified. The assets that we've identified belonging to someone else somehow harms us when there's an order preventing their dissipation. That's odd, right? So the two things we need, one, we need a human being to testify before we can let

03:40

these assets out. There's no human being willing to testify.

So what we said was freeze everything where it is. When a human being can testify, we'll talk to him. And meanwhile, don't transfer anything. A status quo --

THE COURT: But also you're asking for number two, which is to identify the assets?

MR. REISNER: Yes. But here is what it is. If you say don't dissipate any assets, that's okay, too. I'd prefer to know what the assets are.

THE COURT: Which is plaintiff's proposed order --

MR. REISNER: Well, the difference is --

THE COURT: -- the scope of it.

MR. REISNER: -- plaintiff says I'll talk to you about the four assets I've identified, not all the other assets. That's the word game that's going on. What we're saying is freeze everything because we don't know, and we can't get a human under oath to tell us. So freeze it all, freeze all of it, and let him get done with his Fifth Amendment issue.

MR. ROSE: Your Honor?

THE COURT: Just a second, please, Attorney Rose. I want to hear from Attorney Katz.

MR. KATZ: If this -- if this case proceeds for even one minute into discovery, my first interrogatory to Troca, which has no testimonial Fifth Amendment privilege and would have to answer in interrogatory, is describe -- this would be number one, describe everything that you did with the $6

million in Bulk MRO's cash that was held in an IOLTA account and a JP Morgan account, describe in detail everything.

My second interrogatory would be, explain the ways that Troca helped Mitra Das and Kerry McAnistan purchase the house in Boca Raton. Because those two questions will determine whether the cash that Kerry McAnistan and Mitra Das received from the cashout mortgage from the Boca Raton house in fact is owned and controlled by Troca and basically was laundered through Mitra Das and Kerry McAnistan.

I agree with Mr. Reisner. It's not enough to just say these are the four assets, the ones that Mr. Rose's partner emailed to me. Okay.

MR. ROSE: We didn't say these are the four assets.

THE COURT: Just a second. Let him finish.

MR. KATZ: It said that Cayan Group is holding the following assets for Bulk, okay? If this case goes to discovery, Troca should, through interrogatories or a 30(b)(6) witness, not just document production, should be made to answer the question: Where else did the cash go? What other assets was the cash used to purchase? Even if it was purchased in the name of Mitra and Kerry McAnistan, if Kerry McAnistan and Mitra Das got the cash to purchase a two and a half million dollar house in Boca Raton because Troca gave it to them, guess what? That's an asset that should be deemed Troca's for purposes of this interpleader.

03:44 03:44 03:44 03:44 03:45

Unfortunately -- we know the house exists. I can look it up on Zillow right now. I know how much it's worth. I know what it looks like. I know there's a lis pendens on it. Where did the cash go? Where did the cash go from the cashout mortgage? Because if it was purchased with Troca's money/Bulk's money, then the cash from the cashout mortgage is also Bulk's money and it's also being effectively controlled by Troca.

So they've got to pick their poison here. They have got to make -- they have made their bed, they have got to sleep in it. They filed this suit. They should have to answer those types of questions if they want discovery to go forward. Simple as that.

THE COURT: Attorney Rose, I'm going to hear from you, but I just -- and I'm going to go back over the prior transcript, today's transcript, and over the papers to make sure that I fully understand the position of plaintiff because it just seems to me that plaintiff is asking for things that places them at risk, and so I want to make sure I understand it. But I'm going to give you an opportunity to respond.

MR. ROSE: I understand that point, Your Honor. And we acknowledge that in our papers, but can I just make two points? We gave the list. My partner gave the list to the interpleader defendants as a way to try to advance the discussion toward a proposed order that both sides could agree

to. That's why we gave the list. So I understand Mr. Katz is now here ridiculing it, and I get it. He doesn't believe it. That's fine. But that's the purpose behind identifying those assets, whatever they're worth, Your Honor, whether they're worth a buck or millions of dollars, okay? That was the purpose of doing that.

And the issue with saying just freeze everything, Troca Global is an operating entity that holds assets that have nothing to do with Bulk MRO, that didn't originate with Bulk MRO, that have nothing to do with the dispute between Brevet and Bulk. And an order from the Court that extends beyond assets that originated with Bulk would make it impossible for Troca to operate.

THE COURT: So just hold on one second. Attorney Reisner, you keep throwing up your hands. So let me understand why you're throwing up your hands at that point.

MR. REISNER: Because, Your Honor, the source data has to be Mr. Das. So is he testifying now that there are no other assets? Is he not testifying now? I mean, what is this --

THE COURT: I thought you were throwing up your hands to the point about Troca as a global business that has other things going on that have nothing to do with Bulk?

MR. REISNER: It may, but you can't take counsel's word that was given him, probably by Mr. Das, that that's all the assets that are involved. That's the point. When he wants

to hide behind the Fifth Amendment, he won't testify.

THE COURT: So -- all right. Let me shift gears. Even though with my limited understanding, and certainly all of you are more familiar with the circumstances of both this case and the other, even though I have an indication that there may be some risk involved for plaintiff and the defendant in the criminal case and even counsel who's representing plaintiff in this action. But if it's your position, Attorney Rose, that this case should not be stayed, that it should go forward, then why wouldn't I grant the defendants' proposed motion? All right, maybe the scope of it, I think it was that which is related to Bulk, and maybe I can parse out some language to narrow that. But why wouldn't I do that? And if I do that, do you not care what the government learns from all of this?

MR. ROSE: We would have to produce documents in response to the subpoena. So that's correct, Your Honor. But just to go back to that point, Judge, I really appreciate the point that the language at the beginning of the proposed order needs to be narrowed, because it does. It's unrelated to Bulk MRO as they have it framed. Any order that's issued by the Court should relate to the assets in the interpleader action which relate back to Bulk MRO's assets. That's why we drafted our order the way that we did because I thought it met the spirit of the discussion that we had before the Court on August 29th.

MR. KATZ: How about a two step, Your Honor. How about Troca actually list out all of the assets, whether originating from Bulk or not, just list out the assets. I mean, what else does it have? List it out, and then we can come back and say, okay, which of those assets are originating from Bulk.

MR. REISNER: It's only got value if that list originates with the one party who can make the list, and then it has to be tested, right? I mean, getting the list from counsel is helpful, it's not dispositive, and that's the issue. That's why I want --

THE COURT: But you're not going to get that. You're not going to get that while that criminal case is pending.

MR. REISNER: Which is why I asked for a stay.

THE COURT: But it seems that there are things that you can get in advance of that.

MR. REISNER: But they'll never be full. Here's what will happen --

THE COURT: But it's a beginning.

MR. REISNER: Of course, and I appreciate that in the spirit of which it's given. What I'm saying is I'll get a bunch of documents, right, and I'll have questions, but I can't ask anybody about them. So it will help. It will help.

THE COURT: It will help everyone.

MR. REISNER: Right. And we should do that. But at

the end of the day, until we can pressure test it, we don't know. And we can't pressure test it given Mr. Das's rights even though the wrong party is advancing them. We can't do anything with that until after the criminal case. That's the problem. So that's why I just said let's cut through it. Rather than fight over the scope of the Fifth Amendment, whether they can assert the Fifth Amendment, let's just wait. And what's the harm? The harm may be that there's some asset that Troca is an operating business -- if it's an operating business has to do something with. Let them come back to court. We'll all be reasonable.

MR. KATZ: Your Honor, the practical problem from my perspective is let's say Troca has another asset, and let's say it's a $2 million diamond ring, and I'm just throwing that out there as a hypothetical. How am I supposed to learn that? Well, there's, I guess, three ways I could learn that. One would be just an informal representation from counsel. Two would be Troca responding to an order that Your Honor issues saying list me out all the assets that you hold, and then we'll sort of figure out which ones are Bulk's. Or the third is in response to a discovery request.

I haven't looked up this question, but can you make Rule 26 discovery requests, whether document requests or interrogatories, under Rule 33 before you've even filed a responsive pleading or an answer? I don't know the answer to

that question. I would suggest the answer is no, and I don't want to waste my client's money filing a responsive pleading or an answer. And that's why I think Your Honor should actually -- in order to assess whether there's even subject matter jurisdiction here, should simply order -- as a preliminary matter order Troca to list out all the assets that it currently owns or controls. And frankly, Troca could say of this list here are the ones that we think are Bulk's, and then we could figure out why the other ones aren't associated with Bulk.

I mean, let's just take the equity interest in MJ's Cannabis store, okay? What's the percentage of equity that Cayan Group is holding in the cannabis shop on Bulk MRO's behalf? How much cash was injected into the cannabis shop in exchange for that equity interest? I mean, those are important questions, but those are ones that I think the Court should order Troca to provide rather than forcing us first to answer or file a responsive pleading and waste our client's money only then to have to ask Troca for that information in a Rule 26 discovery request.

THE COURT: All right. So I have another thought that I want to put on the table for your comment. I appreciate what the parties have said, and you've reminded me of the fact that you're concerned about how much legal expenses that you spend at this juncture. But instead of the proposed order that the

defendants have with regards to one and two, one is the freezing and two is the identifying of the assets, why not a two-step process whereas the plaintiff would identify the list of assets to counsel, and then after everyone's review of that, you identify which assets to be -- for order of the Court to not transfer, sell, liquidate, and you tailor that more appropriately?

MR. REISNER: Your Honor, I think it's a good suggestion. Here's the problem. If there was somebody that would stand behind, a principal of Troca that could stand behind the list, you'd have something. Right now there's nobody that stands behind it, right? The only way Mr. Rose can have that information is he makes it up, which he would never do, or he's hearing it from somebody who isn't willing to testify. So what's the value of the list? Where does it come from? They have to take the position it didn't come from Mr. Das.

MR. GALLAGHER: Your Honor, if I may. This is bizarre. Mr. Rose is putting himself in a very precarious position here.

THE COURT: That's what I'm concerned about.

MR. GALLAGHER: If it's anything other than a third-party document that shows where the cash went, where the money was transferred to, if he's relying on anything other than that, he's at risk in providing information to the Court

that is not accurate and continues the criminal conduct of his clients.

So I hear the Court -- you know, my concern originally was Mr. Rose deposing the victims in this case. My concern is not that now. My concern is we have evidence. I don't want to use the civil process to gather additional evidence. We have different means to do that. So he's providing us more evidence. I don't want --

THE COURT: That's what it sounds like to me, and that's the fear that I have, Attorney Rose, for your bar license. And -- but if you're telling me that's the way to go, I mean, I have to accept that, but it just seems to be a very risky proposition. You can respond if you want.

MR. ROSE: Look, Your Honor, I'm representing my client's interests here. I understand based on what Mr. Gallagher said on August 29, what he said today, and what the Court just said that it's, you know, it's potentially a perilous situation. I get it.

MR. KATZ: I think the Court should order Troca to give that list, make very clear that it's got to be a comprehensive list of all the assets, whether originating from the Bulk $6 million or otherwise, a comprehensive list, then counsel can confer with each other about which of those assets can fairly be assigned to Bulk. Because someone is making a judgment that, oh, Bulk's cash is now marijuana in Grafton,

someone made a decision about that. Bulk's, you know, Bulk's money is litigation financing in our marijuana antitrust case, someone is making a decision. But we can get together and make that decision.

03:56 And if Mr. Rose thinks that Your Honor's order is too perilous to his client because an answer would have to come from Mr. Das, he can dismiss the case. The ball is always going to be in his court. If the fire gets too hot for him, he can dismiss the case, and then we'll all be out of Your Honor's hair. 03:56 Mr. Das won't be out of Your Honor's hair because the criminal case is in front of Your Honor, but we will.

THE COURT: I'm more inclined at this moment -- not to say it's my final decision -- more inclined at this moment to pursue this sort of two-step process that I was just describing. 03:57 And if I do that, I think it's worth the parties drafting that language that you want me to utilize, but I would like you to attempt to do it as a group. I get it if you're unable to do that, and then I'll figure it out. I'll make a final determination, if that's the right way to go about it.

03:57 So what I was trying to decide is whether or not I should send you to the attorneys' room now to see if you can work that out. No. All right. By tomorrow?

MR. REISNER: We'll try.

THE COURT: Attorney Rose?

03:57 And that's only if that's the way I decide to go, but

that is my inclination at this point in time.

And if there's a step process that you want me to utilize, also identify that for me. Go ahead, Counsel.

MR. ROSE: Just based on the prior back and forth between counsel, I don't see any way it's going to happen in 24 hours, Your Honor. So I don't want to lead you to believe --

THE COURT: So 48 or by the end of the week, which is it?

MR. ROSE: Why don't you give us to the end of the week.

THE COURT: All right. So I want you to think through all those steps because that is giving plaintiff what plaintiff is seeking, which is to advance this case along, and the only way to advance this case along is by starting there, with freezing what's available, but that's sort of step two -- but identifying what the assets are, and then we can cross the bridge whether or not it ultimately needs to be stayed because you get to a point where nothing really can happen.

MR. REISNER: Your Honor, I would like to preview a question I think is going to arise for you.

THE COURT: Yes.

MR. REISNER: So when we get this communication from Mr. Rose and we ask who supplied this information, and he says I can't tell you, what do we do with that? Because that's how it's going to come down.

THE COURT: You seem to be asking for a whole lot of things that you may never get. So I don't know where you should stop.

MR. REISNER: Well, I'm just asking how -- are you okay with us asking that question and getting an answer, are you not, is it dispositive with respect to a motion? The reason is I don't want to spend a lot of time on that point in the order if you don't care about that issue. I think it's important to know the source, personally, but that's just my view. Other than that, I think we can probably figure it out. I can see that as the sticking point.

THE COURT: I think we all understand that Attorney Rose is representing a client, which is Troca Global, and whatever that source of information is, you know, will ultimately bear out later if the action goes forward.

MR. REISNER: Okay. That's fair. Thank you.

THE COURT: But I think he's a member of the bar and that his representation should suffice at this stage.

MR. REISNER: Okay. Thank you.

MR. GALLAGHER: Your Honor, just for the record, I'm not involved in this process. I'm limited to the purpose here, intervening. I'm not involved because I don't want to be -- I'm not trying to gather information from the case. So I'm not involved in the process, just so the Court knows and it's on the record.

THE COURT: Okay. So I don't know if that means you're not going to appear again or what.

MR. GALLAGHER: I'll be here, Your Honor. What I'm concerned about is we can't use a civil trial just to get information for the criminal case. So I want to make sure those lines are drawn very clearly.

THE COURT: Let me just take a look. Does it make sense to bring you back by the end of the week or early next week? Or no. I need to know what ultimately I need to resolve.

MR. REISNER: I think we'll give you one or two orders, and you'll figure it out.

THE COURT: Okay. All right. And I'll take it from there.

MR. KATZ: Thank you, Your Honor.

THE COURT: All right. Thank you.

MR. ROSE: Thank you.

THE CLERK: This matter is adjourned.

(Adjourned at 4:01 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Linda Walsh, Registered Professional Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, to the best of my skill and ability.

Dated this 18th day of November, 2023.

/s/ Linda Walsh

Linda Walsh, RPR, CRR

Official Court Reporter